# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  **DEBORAH OUSLEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIV-14-554-RAW |
| | ) | |
| 1.  **EASTAR HEALTH SYSTEM,** | ) | |
| d/b/a **MUSKOGEE REGIONAL** | ) | |
| **MEDICAL CENTER, LLC,** | ) | |
| and | ) | |
| 2.  **CAPELLA HEALTHCARE INC.,** | ) | |
| d/b/a **MUSKOGEE REGIONAL** | ) | |
| **MEDICAL CENTER,** | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Deborah Ousley, and for her Complaint in the above-entitled action, alleges and states as follows:

## PARTIES

1. Plaintiff, Deborah Ousley, is an adult female resident of Muskogee County, Oklahoma.

2. Defendants are:

   a. Eastar Health System, d/b/a Muskogee Regional Medical Center, LLC ("Eastar"), an entity doing business in Muskogee County, Oklahoma; and

   b. Capella Healthcare Inc., d/b/a Muskogee Regional Medical Center, LLC ("Capella"), an entity doing business in Muskogee County, Oklahoma.

1

## JURISDICTION AND VENUE

3. This is a cause of action arising out of Plaintiff's former employment with Defendants based on claims of (a) age discrimination in violation of the ADEA, (b) disability discrimination, harassment and retaliation in violation of the ADA and ADAAA, (c) retaliation for use of leave under the Family Medical Leave Act ("FMLA"), (d) whistleblowing in violation of state law, and (e) blacklisting in violation of state law.

4. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331. This Court has supplemental jurisdiction over Plaintiff's corresponding state law claim as it arises out of the same core of operative facts as the federal claims and jurisdiction over it is vested in this Court under 28 U.S.C. § 1367(a).

5. All of the actions complained of herein occurred in Muskogee County, Oklahoma. Defendants are doing business in such county and may be served in said county. Muskogee County is located in the Eastern District of Oklahoma. Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6. Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about May 1, 2014. Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated November 10, 2014 (received by Plaintiff by mail thereafter), and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7. Plaintiff was born in 1960, making her over the age of forty (40) at all times relevant hereto.

8. Plaintiff began her employment with Defendants in or around June 1981 as a Graduate Nurse in Pediatrics and the Surgical floor. In or around 1988, Plaintiff was promoted to Team Leader in Pediatrics, and in or around 1990 became Charge Nurse in Labor and Delivery. As a Charge Nurse, Plaintiff carried a full patient load in addition to supervising other nurses.

9. In or around June 2011, Plaintiff took FMLA leave for approximately ten (10) weeks for situational stress due to the death of her son.

10. While on FMLA leave, Plaintiff received a letter in the mail from Defendants, notifying her that her pay was being reduced by $2.82 per hour. Plaintiff immediately called and questioned her then supervisor, Ronda Pingleton, about the reduction in pay and was told that $2.00 of the reduction was allegedly due to a restructure of the manner in which Charge Nurses were paid. However, she was given no reason for the additional $0.82 reduction in her pay.

11. Upon her return to work from FMLA leave, Plaintiff met with Human Resources Manager, Bill Peterson, who told Plaintiff that the $0.82 reduction in pay was allegedly due to an overpayment in 1994, approximately seventeen (17) years prior, because she was allegedly overpaid when becoming a Charge Nurse. However, Plaintiff had been a Charge Nurse since 1988, informed Peterson of the same, and asked to see documentation

showing the alleged overpayment. Peterson refused to show Plaintiff any supporting documentation and told Plaintiff "good luck proving it" when she stated Defendants' reasoning was incorrect. Plaintiff then unsuccessfully attempted to speak with the Director to discuss the change in pay.

12. In or around Spring 2012, Plaintiff questioned the forced resignation of Pingleton. Plaintiff told the Chief Nursing Officer, Rose Lopez, that she did not feel that Pingleton should have been let go.

13. In or around July 2012, Plaintiff was given a written counseling from Lopez after a joint commission survey allegedly about a preprinted order form and told that she needed to turn herself into the Board of Nursing. However, when Plaintiff contacted the Board of Nursing about the issue, she was told that she had done nothing wrong. Shortly thereafter, Lopez was forced to resign.

14. Defendants have experienced drastic turnover in management staff over the past five (5) years. In fact, Plaintiff had three (3) different supervisors in her last four (4) years of employment with Defendants.

15. Plaintiff went out on FMLA leave again from on or about November 15, 2013 until December 31, 2013 for surgery. Plaintiff underwent a hernia repair with abdominoplasty.

16. While Plaintiff was on FMLA leave, Defendants' Maternal Hospital Services moved locations, and Delaine Bartsch began her position as the Director over Women's

Services and the Executive Director of Defendants' East Campus, as well as Plaintiff's new supervisor. Plaintiff did not have any personal interaction with Bartsch until Plaintiff's wrongful termination on or about February 21, 2014.

17. Approximately one week after Plaintiff returned to work from FMLA leave, in or around early January 2014, Plaintiff was approached by the Hospital's new CEO, Tony Young, and asked how things were going in the new building. Plaintiff stated that she was concerned with some of Defendants' practices concerning patient care, including but not limited to the use of outdated procedures in Cesarian sections, the failure to staff the legally required number of nurses to provide adequate medical care in the birth and recovery rooms, the improper designation of such rooms and false information being provided to the Oklahoma Department of Health about the staffing and room requirements. Additionally, Plaintiff reported that she was receiving complaints from the nurses that the Nurse Practitioners (who had previously worked with Bartsch at a different hospital) were using unsafe practices with patients, specifically practices that did not comply with the Neonatal Resuscitation Program ("NRP"). Young replied that he would look into Plaintiff's concerns and speak with Bartsch about the same. However, in or around the first week of February 2014, approximately three weeks prior to Plaintiff's termination, Plaintiff had to speak with a nurse practitioner to again ask why she was not using practices compliant with NRP.

18. Shortly after Young left, Bartsch came looking for Plaintiff, visibly upset. However, Plaintiff was helping a patient on another floor, and Bartsch did not wait to speak

5

with Plaintiff. Therefore, no discussion took place that day.

19.     Also, in or around January 2014, Kathy Bell, the Interim Manager over the Charge Nurses, was yelling at the unit secretary and a nurse about the procedure for admitting a patient. Bell was angry that a nurse could not go to the first floor of the hospital to potentially deliver a baby at the hospital's entrance. Plaintiff told Bell that they were too understaffed to comply with Bell's requests and that what she was requesting would not be appropriate.

20.     On or about February 13, 2014, Bell spoke with Darla Boydstun, one of Plaintiff's co-workers, about how the unit was operating. Boydstun stated that there was a learning curve after the move, but that things seemed to be operating well. Bell then told Boydstun that "the toxic individuals will be gotten rid of." Subsequently, Boydstun was terminated in or around March 2014.

21.     Dr. Jonathan Baldwin was hired by Defendants in or around March 2013. However, after having been at the hospital for approximately one (1) year, he had still not made his pre-order forms for his charts, instead using another doctor's form and crossing their name out. Previously, Dr. Baldwin had self-reported to the Oklahoma Medical Board for alcohol abuse. And, according to the Oklahoma Medical Board's website, as of May 1, 2014, he had not updated his information to include his current employment with Defendants.

22.     On or about February 16, 2014, Plaintiff was working with an understaffed department and a full patient load with five (5) deliveries that day. Dr. Baldwin was working

that day as well.  Plaintiff spoke with Dr. Baldwin about his intent to perform an unscheduled C-Section on a woman who was less than 39 weeks into her pregnancy, as all C-section deliveries under 39 weeks would be reviewed by the hospital.  Plaintiff suggested an ultrasound be taken to see if they could substantiate the need for the early delivery.  Dr. Baldwin was visibly frustrated and threw his clipboard onto a counter, but complied.

23.     That same day, Plaintiff worked a thirteen (13) hour shift with only one break to drink some juice, as Plaintiff is hypoglycemic.  As such, Plaintiff is a qualified individual with a disability within the meaning of the ADA and ADAAA in that she was disabled, has a record of disability, and/or was perceived as disabled.  Further, her disability substantially limits and/or limited her in one or more of her major life activities, including but not limited to walking, standing, vision, eating and concentration.  Her disability impacts one or more of her internal bodily processes, including but not limited to normal circulatory, digestive, nervous, and cardiovascular function.  However, at all times relevant hereto, Plaintiff was able to perform the essential functions of her job with or without reasonable accommodations.

24.     Plaintiff continued to work past the end of her shift to complete paperwork, computer entries, pre-orders, and to admit an additional patient.  In doing so, Plaintiff found that Dr. Baldwin had not completed his orders.  Therefore, Plaintiff attempted to call Dr. Baldwin four (4) times and left him a message, stating that she needed to speak with him regarding the orders.  Plaintiff then prepared the orders (as was the customary practice)

before going to assist other patients.

25. Plaintiff was off work the following day, before returning to work on or about February 18, 2014. Plaintiff heard that Dr. Baldwin was frustrated with her for initiating the preprinted orders, so she attempted to call him to explain what had happened. However, he did not let Plaintiff speak and told her there was nothing to worry about.

26. The following day, on or about February 19, 2014, Plaintiff received a call from Bartsch telling her she needed to stay home pending an investigation.

27. And, on or about February 21, 2014, Plaintiff was called into the office and terminated by Bartsch and Peterson for allegedly practicing outside the scope of her license in regards to Dr. Baldwin's orders.

28. However, the reason given for Plaintiff's termination was false and merely pretext, as Plaintiff had informed Dr. Baldwin of the orders and he failed to follow-up on them. Additionally, it is the usual and accepted practice that nurses fill out doctors' orders, and similarly situated younger individuals executed orders without any repercussion. In fact, many doctors expected the nurses to do so. Furthermore, the delivery orders state to initiate the postpartum orders. And, Dr. Baldwin frequently did not sign his orders.

29. In the last several years of Plaintiff's employment, there was a increase in Defendants' hiring of younger, newly licensed nurses. And, based upon information and belief, Plaintiff has been replaced by a significantly younger individual.

30. After Plaintiff's termination, a prospective employer performed a reference

check in or around April 2014 with Defendants regarding Plaintiff's employment. Defendants gave an inconsistent explanation for Plaintiff's termination, claiming she had been terminated due to her "lack of flexibility."

31. As a direct and proximate result of Defendants' actions, Plaintiff has suffered the injuries described hereafter.

## COUNT I - ADEA

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows.

32. The matters alleged above constitute violations of the ADEA in the form of age discrimination.

33. Plaintiff is entitled to relief under the ADEA because, at all times relevant to this action, she was over the age of forty (40), was satisfactorily performing her job, was terminated, and she was treated less favorably that similarly situated, younger employees.

34. As damages, Plaintiff has suffered lost earnings, past and future, and other equitable and compensatory damages allowed by the Civil Rights Act of 1991. Plaintiff is also entitled to liquidated damages based upon Defendants' willful conduct.

## COUNT II - ADA and ADAAA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

35. The matters alleged above constitute discrimination, harassment and retaliation

based on known, a record of and/or perceived disabilities in violation of the ADA and ADAAA.

36. More specifically, Plaintiff suffers from a disability in the nature of a physical impairment (i.e., hypoglycemia) which substantially limits her ability to perform one or more major life activity, as detailed above. Further, Plaintiff's disabilities impact one or more of her internal bodily processes, as detailed above.

37. Despite said impairments, Plaintiff could perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

38. As a result of Plaintiff's medical conditions, Plaintiff was a qualified individual with disabilities within the meaning of the ADA and ADAAA, in that, she was disabled, had a record of a disability, and/or was perceived as disabled.

39. As a direct and proximate result of Defendants' actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

40. Because the actions of Defendants were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages (to the extent available).

## COUNT III: FMLA

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

41. The matters alleged above constitute retaliation for Plaintiff's use and/or

attempted use of medical leave for self care in violation of the Family Medical Leave Act.

42.  Plaintiff was entitled to medical leave because she required time off to care for herself following surgery and worked for Defendant (i.e., entities with more than 50 employees within a 75 mile radius of Plaintiff's worksite), for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

43.  Defendant retaliated against Plaintiff for her use of time off.

44.  As set forth herein, Defendant's actions were in willful violation of the law. Defendant was aware of FMLA and the requirements contained therein, but willfully violated Plaintiff's FMLA rights.

45.  As a direct and proximate result of Defendant's actions, Plaintiff has suffered injuries and is entitled to recovery of all damages, including, but not limited to, lost wages (past and future), liquidated damages (based on the willfulness of Defendant's violation of the FMLA), attorney fees and costs.

## COUNT IV - Whistleblowing

For her fourth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

46.  The acts above-described also constitute a violation of Oklahoma's public policy which prohibits wrongful termination and retaliation against a whistle-blower for performing an act consistent with a clear and compelling public policy, i.e., refusing to participate in an illegal activity; performing an important public obligation; exercising a legal

right or interest; exposing some wrongdoing by the employer; and performing an act that public policy would encourage or, for refusing to do something that public policy would condemn.

47. As damages, Plaintiff has suffered lost earnings, past and future, and other compensatory damages.

48. Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT V: Blacklisting

For her fifth cause of action, Plaintiff incorporates all prior allegations and further allege and state as follows:

49. The acts of Defendants described above constitute blacklisting in violation of Okla. Stat. tit. 40 § 172.

50. As damages, Plaintiffs are entitled to all damages allowed by state law.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendants and assess actual, compensatory, punitive damages, and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 19th DAY OF DECEMBER, 2014.**

                        s/Jana B. Leonard
                        JANA B. LEONARD, OBA# 17844
                        EMILY VAN VOLKINBURG, OBA # 31744
                        LEONARD & ASSOCIATES, P.L.L.C.
                        8265 S. WALKER
                        OKLAHOMA CITY, OK 73139
                        (405) 239-3800       (telephone)
                        (405) 239-3801       (facsimile)
                        leonardjb@leonardlaw.net
                        emilyv@leonardlaw.net

                        JURY TRIAL DEMANDED
                        ATTORNEY LIEN CLAIMED